Thank you for the opportunity to be here this afternoon, or morning I guess still. This is a really unique situation because I get to argue my case after all your questions. My case is a little different because of the issue of whether or not I satisfied the Prima Foster case. Don't you have an even harder case because in your case the special master found there was no satisfying the Alton test because there was no brain injury. There was nothing to show that the vaccine caused the condition. Absolutely, I do have a harder question. I have to convince you that we both used the wrong standard in the Prima Foster case and no standard in the factor unrelated case. You had the benefit of hearing the interchanges earlier about Alton. Do you have a view as to what Alton requires, the part two of Alton in particular? I can't answer that question. Let me just say that in, and this is essential to my Prima Foster argument, the pattern observed in Stone and in Mearsburg and Simon provided the logical sequence of cause and effect that is required by Alton. My question really goes to what exactly does that language from Alton mean? Step two is the case specific facts fit the medical theory presented in case one. And step three is that the time frame is proximate or medically appropriate. In my Prima Foster case, the government and the special master acknowledged that I satisfied one and three. The question is did I satisfy two? In the original decision in Hammock, the special master, I believe, strongly suggested I had. He said he would likely have awarded compensation had there not been evidence of a factor unrelated. He said of an alternate cause, but I think the legal import in this original decision was in the absence of evidence that the SC1A gene mutation caused Rachel's illness. He would have ruled for me because the pattern described in Stone, described in my case, and also Mearsburg and Simon provided, and he uses the word, the discussion about referencing this pattern. He calls this pattern an off-observed pattern in vaccine cases and said that in Mearsburg, Simon, and in Stone, that was enough to establish the Prima Foster case. So why did he change on remand? He changed on remand because he elevated the burden of proof he required of us. He required me to prove instead of a logical sequence of cause and effect, let me go quickly back to your specific question about whether it requires a logical sequence of cause and effect, which could indicate causation or a logical sequence of cause and effect that is proof of a causal relationship. Alton makes clear, and the statute makes clear, we can rely on inference in this program. Sure, sure, but the ultimate question is which, at the end of inference, evidence, conclusions, findings, what is the standard that this portion of Alton requires the special master to observe? I believe that Alton Step 2 means you present a sequence of cause and effect in your individual client's case that fits the medical theory that you established in Step 1. And that suggests, provides an inference of, it's circumstantial evidence of causation. So your question about whether you need something that could indicate or proof of, really, quite frankly, is not exactly the right words. Then how do you get around the no brain injury? If there would have been this harm caused by the vaccine, that would have been evidence somewhere, wouldn't it? Indeed it was. She had another seizure. My client had another seizure. No, no, evidence somewhere in her physiology. Wouldn't there have been some indication in her brain? Wouldn't they have been able to detect that there had been an alteration caused by the vaccine, which they could not. They could find, of course, that she had a genetic mutation which caused a condition, but they couldn't find anything in her brain. Well, the fact of the matter is that you don't usually. Only in the last few years... Now we're talking about facts, see, but that's the problem, is that you fail on the facts. No, it's not, because the statute makes it clear, and Alton makes it clear, we don't have to show that degree of mechanistic evidence. We don't have to show an MRI finding. We don't have to show, it is sufficient. We don't have to show... You can create an inference. Inference is enough. You can create an inference, but the problem is that the facts were against your inference. You had an inference, a logical sequence which followed your theory, but then they looked at the facts and there was no brain injury to sustain it. But in fact, there was a genetic mutation in every cell of her body which produced the condition. That's incorrect, because the facts... What's incorrect in it? I'm sorry? What was incorrect in that? What was incorrect in that is that there wasn't evidence of a brain injury. They found there was no evidence, is that right? The special mass, well, I think I have a way of explaining that. Did they find that? It is an important question. Well, it's good because I wrote it because I think I can reproduce it without finding it. The point here is, this is an important point. You go to the very end of the special master's decision, his original decision, and he says, had there been evidence of a brain injury, I would have awarded compensation even in the context of an SCN1 gene mutation. So that proves that the genetic mutation in and of itself is not always an adequate alternate cause in the context of the testimony presented in Rachel Hammond's case or the special master's finding. The question then is, in the context of a legal standard for causation, in that context, did what we know the vaccine did cause amount to some kind of injury? Did the vaccine cause, in a legal sense, an injury? And what did the vaccine cause? Let's get it correct. Dr. Raymond says SEMI, that's what you're suing for, right? It's compensation for SEMI, S-M-E-I. Right. Dr. Raymond says that's unrelated, that was his word, unrelated to vaccine administration. He didn't say that. Now this is what he said. He said the vaccine caused, he was asked a specific question. Did the vaccine play any role in this child's illness? And he said not other than triggering the initial seizure. Not other than. So he did acknowledge that it triggered the initial seizure, which was, and this is the important point, the initial symptom of the S-M-E-I. Rachel Hammond and Welles Amelia Stone were perfectly healthy. They looked fine, they developed normally. There was nothing apparent wrong with them before the vaccination. And that's conceded. They received a vaccination. The next, within 24 hours, they had a seizure, a long seizure. A seizure that everyone conceded can damage the brain. And from that moment on, they had a severe seizure disorder, S-M-E-I. You cannot distinguish the beginning from the illness. Well, that's really the question that we're struggling with in both of these cases. Can you or can't you? I mean, suppose, I know this isn't the facts of either of these cases, but let's just think this through. Suppose that what had happened to the child in this case is that there had been a vaccination and a very mild, very short seizure, but an observable seizure condition nonetheless. And the evidence from the respondent's expert credited by the special master had been that that seizure event was discrete, entirely separate, did not trigger, did not accelerate, did not have any effect on the ultimate development of her seizure condition. You wouldn't suggest, would you, that nonetheless, because it was a seizure, that she's entitled to compensation? With all due respect to the special master... Well, I... No, no, I just want to say, because this is the critical point. You're absolutely on this critical point. In several places in the testimony and in several places in the opinion that says, we didn't prove that the vaccination altered the course of this child's illness. Of course it altered the course. Excuse me, Mr. Webb, if you interrupt Judge Bryson one more time, I'll have to ask you to sit down, all right? So you sit and listen very quietly until he finishes his question and then answer it. Really, I just, I want to, first, I understand that's your position with respect to the special master's findings and so forth, but first, in order for me to understand the baseline from which we're working here, I would like you to answer my hypothetical, even though I completely understand that's counterfactual in this case. Your hypothetical is if it was completely discreet. Well, my hypothetical is that it's a very minor seizure, and the finding is, it's a seizure, but it's a minor seizure, and the finding is that it did not have the effect of accelerating, triggering, or any other effect on the development of the condition. Would you say, well, nonetheless, it's part of the overall condition? Would you say that it has to have had some effect? What would your position be under those circumstances? I'm sorry, I misunderstood your hypothetical. I would not say that a short seizure that everyone believed could not cause, or was not prone to cause injury, I would not say that that altered the child's condition, because that seizure is discreet. It is separate. It is not a substantial event. So, if you alter that set of facts by saying that, well, some experts concluded that it did have a relationship, other experts concluded that it didn't, and the special master found that it didn't, then still no recovery, right? Isn't that sort of where we're at, isn't it? Well, that's my question. I'm not sure of the difference between the hypothetical and that case. Well, and that is, we spent lots, and this is one of those situations where evidence was submitted about the question of whether there was a, whether you should consider these seizures discreet events. And the special master, in part, because he, I'm sorry. I don't, in a sense, I don't think he ever answered that question. We've always felt like we were in separate universes. We keep saying the seizure, it caused the seizure, of course, and they keep saying it didn't cause the seizure, of course. We keep saying, of course it altered the cause, they keep saying, well, it doesn't. But this change of a few weeks or months doesn't make a difference. I think the question is that whether, I mean, the special master gets to choose if there's one testimony, one expert that says it was discreet and the other says it's not. But he has to apply a legal standard to that decision. And that's the one point I want to make before my time runs out. And that is SMEI, or Durette Syndrome, has a known relation to DTAT vaccination. It is absolutely clear throughout the medical literature that the DTAT vaccine is a very frequent cause of the onset of the seizure disorder. It's clear from the evidence I submitted on remand that the special master chose not to consider that it moves forward in time, the onset of SMEI or Durette Syndrome. And it's apparent to at least some experts that the data in there at least raises the question of whether it makes things worse. The critical question in this case was, did it make a difference? And that evidence answered it. It answers the question of whether it made a difference and it should have been considered. And I apologize for going over my time. And I do apologize for interrupting. I didn't. Let's hear from Ms. Davis. Would you give her an extra minute? And then we can restore a minute of Mr. Webb's rebuttal too. Good morning. May it please the Court, I'm Althea Walker Davis and I represent the Secretary. As you already have observed, the special master made two critical factual findings in this case. One being that petitioners did not demonstrate that the initial seizure the child suffered caused any damage or affected her ultimate outcome. And the second being that the child's seizure disorder was caused, in fact, by her genetic mutation, the SCN1A mutation. The special master's findings in these regards were supported amply by the testimonies of Dr. Wiesnitzer, Dr. Raymond in particular, who is a neurogeneticist, and also by the medical literature. And these are the findings we're asking this Court to affirm. Your Honors have asked a question about the relationship of the first seizure to the child's condition. And Dr. Wiesnitzer in particular testified on this point and it's documented in the decision that that first seizure that was triggered by the fever from the vaccine did not impact the child's condition. And in fact, when Dr. Kinsmore was asked about that same issue, he admitted that a trigger doesn't have to have a further impact. And he could not, in fact, point to anything in the record, the factual record, that showed that this child had damage from her first seizure. The special master's analysis of causation and fact in this case was legally correct. He analyzed all the evidence, he applied the appropriate legal standards, and concluded that respondents had set forth a reliable and logically probable sequence of events that showed that the genetic mutation was, in fact, the cause of the child's condition. The evidence showed that Rachel Hammond had a genetic condition in her SCN1A gene, that this mutation causes SMEI. And Dr. Raymond demonstrated through a sequence of about six different factors that this was, in fact, the cause of her condition. The evidence shows that children with SMEI, 80 to 90% of them, have a genetic mutation, and that the onset of their condition often begins with a prolonged seizure, with or without temperature elevation or fever. The onset of Rachel's condition was, in fact, consistent with what is known about SMEI. She had a prolonged seizure, she had a slight temperature, and she went on to have additional seizures that were unrelated. Specifically, Dr. Berkovic and his colleagues noted that individuals with SCN1A mutations seemed to develop SMEI whether or not they received immunizations in the first year of life. And their recommendation, ultimately, was not to withhold vaccines from these children. Petitioners, in their brief, argue that their burden is to show, on prong two of Alfin, is to show a logical sequence of cause and effect, which suggests that the vaccine contributed to the cause of an illness or injury, and that Alfin allows medical opinion to describe circumstances which suggest causation. However, that is not their burden. Their burden is to show a logical sequence of cause and effect, showing that the vaccine was the reason for the injury. Petitioner's argument here is akin to the arguments they made in Moberly, where they argued for a more relaxed standard of causation, arguing that they only had to show that the condition was likely caused by the vaccine. But this court has said mere proof of plausibility is not sufficient. That is not the statutory standard. While there's no dispute that DTaP vaccine can cause a fever, and that fevers trigger seizures, including complex febrile seizures, and some complex febrile seizures can cause brain damage, that is not sufficient to show causation. That may get you to prong one, but it doesn't get you to proof of causation in fact. Petitioners misconstrued the special master's statement in his remand decision as requiring direct proof of damage to her brain. But that's not what the special master required. The special master simply asked for some indicia that the child suffered any damage from her first seizure, and petitioners weren't able to offer any. Any damage? Any evidence of the damage from the first seizure. But the damage presumably would have to be to the brain, right? Correct. Some evidence that the child suffered. Their theory was that the child suffered a seizure from the vaccine, and that seizure caused brain damage. So they had to show evidence of that brain damage, and they were unable to. In fact, Dr. Kinsporn admitted there was nothing in the record that would show that. The petitioner here is seeking a finding that he established causation simply because his expert offered his theory and presumed that there was damage from that first seizure based on the length of the seizure. But that is not the standard. Again, his evidence did not support his theory of causation. He did not show any evidence to support prong two of Alfie. Is there any medical evidence that someone with SMEI can live a life without that condition manifesting itself? In other words, could they live a normal life? Someone with SMEI. Unless there was a trigger. Of course, the trigger would kick them into the condition. But could they live with this condition and normal life? The evidence in the record was that people with this mutation, more likely than not, would exhibit seizure disorder. There was an absence of the mutation in the normal population, so that supported that. It doesn't mean that every child will. That would be scientific certainty, and we don't have that information. But more likely than not, a person with this mutation was going to have SMEI. Just to be clear, and we've been over this with each of the lawyers, but be clear. If there were any effect of the initial febrile post-vaccine seizure that had any impact on the subsequent seizure condition, the development of the seizure condition, is it the government's position that that would be sufficient to justify compensation? I think if the medical testimony showed that there was an impact on the ultimate condition, such as if the condition had changed... Let's assume that it had the effect of accelerating onset. Not severity of the condition. The condition is exactly the same as it would have been, but the onset occurred earlier than it might otherwise. Would that be enough to justify the award of compensation under the program? I respectfully argue it would not be, because if there's no ultimate change in the child's condition, the earlier onset hasn't affected them. Well, I think you just said something like, more often than not, the condition develops in people that have the mutation. Which suggests, to me at least, that in some instances it doesn't. Unless you meant something else. In which case, earlier onset may mean onset that wouldn't have occurred at all? There's a tension between arguing that it's absolutely certain that anyone with this mutation would never have SMEI, would always have SMEI. The medical evidence doesn't show that there is someone with this mutation who's living normally with it. There's no one who has this mutation that's living normally with it? There's no evidence of that? Not in the medical literature that was provided in this case. There wasn't a case. Obviously that would have been something petitioners would have presented as support for their argument that the vaccine altered the child's course. But there was no evidence of that in this case. And what is known right now through medical science is that if you have this mutation, you're going to have seizures at some point. Whether it's triggered by a vaccine or... Now are you suggesting it's their burden to come up with some evidence to show that the vaccine had a relation to the condition? Your Honor, if they're arguing that the vaccine caused the condition, then they want to put forth whatever evidence that suggests that there is a cause between the two. And in this case, the evidence that they're relying on doesn't show that... The evidence in this case that the special master accepted doesn't show that there was a relationship between the vaccine and this child's condition. And in fact, it was a genetically predetermined condition for this young lady. As I said, the special master applied the correct standard of proof with respect to the respondent's burden and petitioner's burden. In fact, in this case, the special master found that the petitioner didn't meet their burden, so the burden never shifted to the respondent. He applied this court's teaching in Bill 11 and found that the vaccine had no relation to the condition. We're starting to hear some of the same things again. Do you have something new for us? If there's no further questions... Thank you. Mr. Webb? Thank you. I want to answer your last question. Please. The evidence is clear that normal people do have SCN1A gene mutation. Is that in the record? That's in the record. It's all over the record. No, no, no. Show me that in the record. Let me get my... The best evidence for it is the Gapien article, which is Exhibit 15, and it's on 179 through 221 of the Joint Appendix. That is one of a bunch of articles we submitted on that point. That's the best because it addresses a broad spectrum of SCN1A gene mutations. What they found was that 10% of the normal parents of children with SMEI and SCN1A gene mutations also had the SCN1A gene mutation that the child has. 10% of parents had the mutation. Yes. Now, this gets a little bit complex only in the sense that at the hearing in this matter, the respondent's expert did not testify about the significance of that finding. The respondent submitted some reports that suggested that some of these parents might have what's called mosaicism. That is, they have the SCN1A gene mutation in some of their cells, but not all. There were articles submitted. No testimony was enlisted by the respondent on that point. Now, the question goes on. We submitted... In essence, that was the heart of our hearing on the question of SCN1A gene mutations. We presented many other articles on the proposition that individuals with the same SCN1A gene mutation can have a great variety of different outcomes. There are different mutations at issue here, aren't there? That's correct. But there is no report in the medical literature of this gene mutation. And so we don't know, based on the medical literature, what the outcome would be. And the very last thing I was going to say is on the question of no known relation. That is the language from the statute. There is no real interpretation of it available from your case law. I believe that is probably broader than not known cause of the injury. It says no known relation to the injury alleged in the petition. And if there is a relation, then it's not the kind of thing that can be used for approval. Thank you. Thank you very much. That concludes our morning briefing. All rise. General report adjourned until tomorrow morning at 10 a.m.